United States District Court
Southern District of Texas
**ENTERED**
July 17, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DWAYNE OLSOVSKY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-0523 |
| | § | |
| SEC ENERGY PRODUCTS AND SERVICES, L.P., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Dwayne Olsovsky ("Plaintiff") brought this suit against La Grange Acquisition, L.P. ("Defendant").[1] Plaintiff alleges that Defendant failed to pay him overtime as required by the Fair Labor Standards Act ("FLSA"). Pending before the court is Defendant La Grange Acquisition, L.P.'s Motion for Summary Judgment ("Defendant's MSJ") (Docket Entry No. 21). For reasons stated below, Defendant's MSJ will be granted.

---

[1] Plaintiff's Original Complaint ("Complaint"), Docket Entry No. 1, p. 1. In the Complaint, Plaintiff identified the defendant as "SEC Energy Products and Services, L.P." Defendant has since identified itself as La Grange Acquisition, L.P. and stated that the Complaint incorrectly named it. See Defendant's Answer and Affirmative Defenses to Plaintiff's Original Complaint ("Defendant's Answer"), Docket Entry No. 5, p. 1. For purposes of identification, all page numbers refer to the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

I. **Background**

Plaintiff is an individual living in Hallettsville, Texas.[2] Defendant is a Texas limited partnership.[3] Plaintiff describes Defendant as a "full-service design and manufacturing company that provides compression, production, and processing equipment; engineering and construction services; truck-based service technicians; commissioning technicians; OEM parts; and other services for the oil and gas industry."[4] Plaintiff started working for Defendant on or about March 4, 2013.[5] Plaintiff's title was "Project Manager — Construction," but he states that he thought he was being hired as a "process technician."[6] His salary started at $100,000.16 and increased over time to $117,100.72 in 2019.[7] Plaintiff initially reported to Terry Allen, who interviewed and hired him, but Plaintiff soon began reporting to Paz Chavez.[8]

---

[2] Complaint, Docket Entry No. 1, p. 2 ¶ 3.

[3] Defendant's Answer, Docket Entry No. 5, p. 2 ¶ 7.

[4] Complaint, Docket Entry No. 1, p. 4 ¶ 19.

[5] Declaration of Dwayne Olsovsky ("Plaintiff's Decl."), Exhibit A to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 22-1, p. 2 ¶ 2.

[6] Offer Letter, Exhibit B to Defendant's MSJ, Docket Entry No. 21-2, p. 2; Oral Deposition of Dwayne A. Olsovsky ("Plaintiff's Depo."), Exhibit B to Plaintiff's Response, Docket Entry No. 22-2, p. 11 (38 lines 1-4).

[7] Offer Letter, Exhibit B to Defendant's MSJ, Docket Entry No. 21-2, p. 2; Declaration of David Cervantes ("Cervantes Decl."), Exhibit A to Defendant's MSJ, Docket Entry No. 21-2, p. 3 ¶¶ 7-8.

[8] Plaintiff's Depo., Exhibit B to Plaintiff's Response, Docket Entry No. 22-2, p. 13 (47:5-11).

Chavez is employed by Defendant as a "Senior Construction Manager."[9] Both parties cite evidence about Plaintiff's duties. Defendant cites its internal job description for a "Project Manager — Construction," which includes these "Essential Duties and Responsibilities:"

- Oversees and directs construction management for larger or more complex construction projects.

- Ability to prepare project status reports and works to ensure plans adhere to contract specifications.

- Verbally communicate with a wide range of people for project implementation.

- Support Operations and Engineering staff in preparation of technical specifications.

- Assist in reviewing project plans and details for code compliance, proper company and standards and good engineering practices.

- Oversee budgets, timelines and problem resolution related to projects . . .[10]

Plaintiff spent much of his job on equipment installation projects in the oilfield.[11] Plaintiff testified that the planning and paperwork for these projects was done by "project managers" and by Chavez:

> Q: . . . there would be a project manager who would kind of outline the scope of the project?

---

[9]Id. (47 lines 15-17).

[10]Job Description for Project Manager - Construction, Exhibit E to Defendant's MSJ, Docket Entry No. 21-5, p. 2.

[11]Plaintiff's Depo., Exhibit B to Plaintiff's Response, Docket Entry No. 22-2, p. 27 (104:3-12); p. 14 (51:21-23, 52:14-15).

> A: The -- the Project Manager, it was his job to get the equipment built, get with the client, get everything lined up. Then it was turned over to Mr. Paz Chavez, and they got the contractor, signed all the paperwork of what was to be done, how it was to be done, when it was to be done and for what amount of money was going to be spent to get it done . . . All the equipment was sent out into the field, and that's when I went out into the field with it to -- to install it where it needed to go.[12]

Plaintiff would be assigned to projects working with anywhere from five to forty contractors depending on the size of the job.[13] Plaintiff described his role several times during his deposition:

> Q: Okay. And then your responsibility was to make sure that [the project] plan was implemented as directed?
>
> A: My job was to go out and make sure the equipment was assembled correctly.
>
> Q: Okay. And so that the contractors did their piece, whoever else did these pieces as -- as they were designed to occur; is that right?
>
> A: Correct.[14]
>
> * * *
>
> Q: Okay. So is -- is it correct to say that it was your job to make sure that the contractors were doing their jobs correctly?
>
> A: It was my job to make sure that the equipment was

---

[12]Id. at 14 (51:9-23).

[13]Plaintiff's Decl., Exhibit A to Plaintiff's Response, Docket Entry No. 22-1, p. 2 ¶ 3; Plaintiff's Depo., Exhibit B to Plaintiff's Response, Docket Entry No. 22-2, p. 15 (53 lines 21-25).

[14]Plaintiff's Depo., Exhibit B to Plaintiff's Response, Docket Entry No. 22-2, p. 14 (52:12-19).

>           installed correctly.
>
> Q:    By the contractors?
>
> A:    By the contractor.[15]
>
> * * *
>
> Q:    Okay. And were you responsible for making sure that the work was completed up to those company standards and standards of the project?
>
> A:    Yes, I was.[16]

Plaintiff testified that the contractors were mostly untrained "labor hand[s]."[17]

> Q:    So are these contractors -- they don't have any experience doing the stuff . . . they're contracted to do?
>
> A:    A lot of them don't.[18]

Plaintiff testified that, as a result, he had to physically do the work to teach the contractors:

> A:    . . . You have to go out there -- if you got a perfect contractor, you would still have to . . . put in the manual labor to go out there and show them how it's done.[19]

Plaintiff testified that the contractors often could not do a good job, requiring him to step in and do parts of the work himself:

---

[15] Id. at 16 (60:11-17).

[16] Id. at 18 (66:5-8).

[17] Id. (65:8).

[18] Id. (65:20-24).

[19] Id. (65:14-19).

Q: Okay. And if there was a contractor not doing a good job or not doing what they were expected to do, [] whose responsibility was it to address that or make sure that somebody else knew that that function wasn't being completed appropriately?

A: That was up to me. And most of the time, the contractor come out there, if they didn't know what they were doing, I had to get it done, I had to do it, or the contractors would assist me in helping me get it done.

Q: Okay. If there was -- did you ever have a situation where you had [a] contractor that just didn't -- wasn't doing a good job?

A: All the time.

Q: So what would you do, then? Did -- is there somebody you would tell about that or report that to?

A: I reported it to Mr. Paz [Chavez].

Q: Okay. And what would happen in -- in that situation? . . .

A: Nothing would happen.[20]

\* \* \*

Q: What -- what were you supposed to have done? I mean, were you supposed to have escalated it and made sure that somebody came in that could do the job properly?

A: Well, most of the time, I just worked harder. I -- I -- if the contractors wasn't getting the job done right, I -- I was always helping them, I just had to work harder.[21]

\* \* \*

---

[20] Id. at 15 (54:1-22).

[21] Id. (55:24-25, 56:1-6).

> Q: . . . do you kind of see that your role -- like, sometimes you jump in and do the work . . . in order to make sure that overall, the deliverable to the customer is being handled in the right way?
>
> A: That happened all the time.
>
> Q: So you -- you would be jumping in and making sure that things happened appropriately so that the company could meet their deliverable at the end of the project?
>
> A: That was probably the goal.[22]

Plaintiff provided an example of how he worked with the contractors:

> A: Let's just go through a compressor installation. The contractor would set the skid. I would make sure it was level, checked everything. We would install the engine. I would have to help bolt that up. Any missing piping, I had to find that. We'd set the compressor. I had to level that up to the engine for the alignment. I'd have to install the coupling. We'd set the vessels on the skids. The welders would weld them down. I would install all the controls, the level controllers, the shutdowns, all that stuff. I had to put all the tubing on the skids to those controls. When we did construction of any process plants, we had to go through the piping. Did a lot of bolt-up on piping.[23]

Plaintiff testified that he would also spend some time in Defendant's office in Houston, where he would write reports and conduct training, as well as physical tasks in Defendant's equipment shop like bolting up flanges and vessels.[24] In total

---

[22] Id. at 17 (63:12-24).

[23] Id. at 13 (48:11-25), 14 (49:1-4).

[24] Id. at 14 (49:17-23).

Plaintiff estimates that he spent 70-80% of his job doing manual labor in the oilfield.[25]

At his deposition Chavez was asked about the extent of Plaintiff's manual labor on the job:

> Q: Do you agree that Mr. Olsovsky spent the vast majority of his time performing manual labor out in the field?
>
> A: That is not correct.
>
> Q: So, you disagree with that statement?
>
> A: I totally disagree.[26]
>
> * * *
>
> A: The -- the reason I'm telling you he did not do or perform manual labor -- I'm just gonna go out on a limb and just tell you. Mr Olsovsky has a bad hip, and it pops out of place very easily.[27]
>
> * * *
>
> A: [Plaintiff] shared it with me. He said, "Paz, I can't -- I can't be climbing over all this equipment. I can't be pulling on wrenches. I go to the chiropractor once a week or sometimes twice a week."[28]

Plaintiff filed this action on February 17, 2022.[29] Plaintiff alleges that he "regularly worked over 40 hours in a workweek for

---

[25] Id. at 27 (104:3-12).

[26] Oral Deposition Paz Chavez ("Chavez Depo."), Exhibit D to Defendant's MSJ, Docket Entry No. 21-4, p. 17 (62:18-23).

[27] Id. (64:19-22).

[28] Id. at 18 (65:10-14).

[29] Complaint, Docket Entry No. 1, p. 1.

Defendant, but Defendant failed to pay [him] overtime."[30] Plaintiff alleges that this violates the FLSA's overtime requirement and that he is entitled to recover the overtime, costs, and attorney's fees.[31] Defendant filed its MSJ on April 26, 2023, arguing that the evidence establishes that Plaintiff falls within the FLSA's overtime exemption for administrative employees and the exemption for highly compensated employees.[32] Plaintiff filed its Response on May 19, 2023; and Defendant filed Defendant La Grange Acquisition, L.P.'s Reply in Support of Its Motion for Summary Judgment ("Defendant's Reply") (Docket Entry No. 23) on May 26, 2023.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact is or is not genuinely disputed must support the assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "In a dispute about an FLSA [overtime] exemption, the employer has the burden of establishing that the exemption applies." Adams v. All Coast, L.L.C., 15 F.4th 365, 368 (5th Cir. 2021). "When summary

---

[30]Id. at 4 ¶ 22.

[31]Id. at 5 ¶ 28, 6-7 ¶ 37.

[32]Defendant's MSJ, Docket Entry No. 21, p. 6.

judgment is sought on an affirmative defense, as here, the movant 'must establish beyond peradventure <u>all</u> of the essential elements of the claim or defense to warrant judgment in [its] favor.'" <u>Dewan v. M-I, L.L.C.</u>, 858 F.3d 331, 334 (5th Cir. 2017) (quoting <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986)) (emphasis in original). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." <u>Smith v. Regional Transit Authority</u>, 827 F.3d 412, 420 n.4 (5th Cir. 2016).

### III.  **The FLSA Overtime Requirement and Exceptions**

The Fair Labor Standards Act generally requires employers to pay workers one-and-a-half times their normal pay rate for hours worked in excess of forty in a week. 29 U.S.C. § 207(a)(1). The FLSA enables an employee to sue his employer for unpaid overtime. 29 U.S.C. § 216(b). The overtime requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations)." 29 U.S.C. § 213(a)(1). Under the Department of Labor's regulations, the administrative exemption includes "any employee (1) Compensated on a salary or fee basis . . . at a rate of not less than $684 per week . . . <u>(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;</u>

-10-

and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (emphasis added). Work is "directly related to [a business's] management or general business operations" if it is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Examples include "tax; finance; accounting; budgeting; auditing; insurance; <u>quality control</u>; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." Id. § 541.201(b) (emphasis added).

The Department of Labor has issued a modified test for highly compensated employees ("the HCE exemption"). An employee with an annual pay of at least $107,432 is exempt if he "<u>customarily and regularly</u> performs <u>any one or more of the exempt duties</u> or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601 (emphasis added). For example, an employee making over $107,432 would be an exempt administrative employee if he "customarily and regularly performed 'office or non-manual work directly related to the management or general business operations of the employer,' § 541.200(a)(2), even if the

-11-

employee's duties did not 'include[] the exercise of discretion and independent judgment with respect to matters of significance,' § 541.200(a)(3)." Smith v. Ochsner Health System, 956 F.3d 681, 685 (5th Cir. 2020). "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

The Supreme Court has stated that the FLSA's overtime exemptions should be given "a fair reading," not a narrow one. See Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018).

## IV. Analysis

A worker's duties are analyzed under the HCE exemption if his salary exceeds $107,432 per year. Plaintiff acknowledges that his salary met this threshold during the relevant period.[33] Under the HCE exemption, an employee is overtime-exempt if he "customarily and regularly performed 'office or non-manual work directly related to the management or general business operations of the employer.'" Ochsner Health System, 956 F.3d at 685.

Monitoring manual workers and checking their work for quality and accuracy is non-manual work directly related to general business operations. See Zannikos v. Oil Inspections (U.S.A.),

---

[33]Plaintiff's Response, Docket Entry No. 22, p. 15.

Inc., 605 F. App'x 349, 353 (5th Cir. 2015) (per curiam). In Zannikos the defendant was a company that "oversees and monitors transfers of oil between trading partners." Id. at 350. The defendant hired the plaintiffs as "marine superintendents." Id.

> Their responsibilities included observing oil transfers to verify that performance was accurate, legal, and safe. They monitored the loading and unloading of cargo and reported any error or losses . . . and performed quality control functions, including inspecting loading and discharge equipment, identifying problems with equipment safety or calibration, and recommending remedial measures to ship personnel or [the defendant] . . . Finally, the marine superintendents oversaw 'line blending,' during which a number of onshore components, such as oil and gas, are combined and moved onto a ship based on specifications relevant to overseas markets. They assured that tanks were prepared properly for such transfers and that components were blended according to the proper ratios.

Id. at 351. The court concluded that the plaintiffs' primary duty was non-manual work directly related to general business operations. Id. at 354. The court emphasized that "[t]he plaintiffs' work . . . primarily included supervision, quality control, and ensuring compliance with applicable standards." Id. at 353.

Plaintiff's own description of his job includes quality control functions similar to those of the Zannikos plaintiffs. Plaintiff stated that "[m]y job was to go out and make sure the equipment was assembled correctly" and that "[i]t was my job to make sure that the equipment was installed correctly . . . [b]y the contractor."[34] Plaintiff confirmed that he was "responsible for

---

[34]Plaintiff's Depo., Exhibit B to Plaintiff's Response, Docket Entry No. 22-2, p. 14 (52:12-19), p. 16 (60:11-17).

making sure that the work was completed up to those company standards and standards of the project."[35] Asked about contractors not meeting expectations, Plaintiff testified that it happened "[a]ll the time."[36] Plaintiff's testimony shows that quality control of the contractors' work was one of his customary and regular duties.

Plaintiff testified that he also had other duties, including substantial manual labor in demonstrating tasks to the contractors and doing the tasks they could not. But unlike the standalone administrative exemption, the HCE exemption does not depend on whether Plaintiff's manual or non-manual work predominated. It is enough that he customarily and regularly performed a quality control function, which is "non-manual work directly related to [Defendant's] management or general business operations." 29 C.F.R. §§ 541.601, 541.200(a), 541.201(b); Zannikos, 605 F. App'x at 353.

Plaintiff cites Snively v. Peak Pressure Control, LLC, 317 F. Supp. 3d 911 (W.D. Tex. 2018), for the proposition that summary judgment on the HCE exemption is improper if there is a fact question as to the standalone administrative exemption. The court in Snively denied the plaintiffs' motion for summary judgment on the defendant-employers' administrative exemption defense. Id. at 917. The court stated that the defendants had raised a fact issue

---

[35] Id. at 18 (66:5-8).

[36] Id. at 15 (54:12-15).

regarding the plaintiffs' primary duty and denied summary judgment as to the HCE exemption for the same reason. Id. In other words, the defendants offered some evidence that non-manual work was the plaintiffs' primary duty, which was also evidence that the non-manual work was a customary and regular duty. But even assuming without deciding that Plaintiff has some evidence that manual labor was his primary duty, Plaintiff's own testimony shows that quality control was at least one of his customary and regular duties.

Plaintiff concedes that he met the salary threshold for the HCE exemption, and his own testimony "establish[es] beyond peradventure" the HCE duties element. See Dewan, 858 F.3d at 334. Defendant's MSJ will therefore be granted as to the HCE exemption.[37]

### V. Conclusion and Order

The court concludes that Defendant has met its summary judgment burden of establishing the elements of the highly compensated employee exemption beyond peradventure. Defendant La Grange Acquisition, L.P.'s Motion for Summary Judgment (Docket Entry No. 21) is therefore **GRANTED**, and this action will be dismissed with prejudice.

**SIGNED** at Houston, Texas, on this the 17th day of July, 2023.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

---

[37]Because HCE exemption disposes of Plaintiff's claim, the court does not address the administrative exemption or willfulness.